UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. CR-24-146-R |
| | ) |
| CHONG IU PHU, | ) |
| CHANH IU PHU, | ) |
| MATTHEW ALAN STACY, | ) |
| | ) |
| Defendants. | ) |

**ORDER**

Before the Court is Defendant Matthew Alan Stacy's Motion to Enjoin Prosecution and for Evidentiary Hearing [Doc. No. 67]. Mr. Stacy's motion argues that his conduct complied with state law and the prosecution of these charges must therefore be enjoined pursuant to a congressional appropriations rider that prohibits the Department of Justice from spending funds to prevent states from implementing their own state medical marijuana laws. The government responded in opposition [Doc. No. 87] and Mr. Stacy replied [Doc. No. 99]. The Court held a hearing on September 24, 2024 where the parties presented oral argument regarding Mr. Stacy's request for an evidentiary hearing and submitted supplemental briefing [Doc. Nos. 126, 133, 134, 138, 151]. The Court concluded that an evidentiary hearing was warranted and the hearing was held on January 28-29, 2025 [Doc. Nos. 157, 179, 180]. Following the hearing, the parties submitted proposed findings

of fact and conclusions of law [Doc. Nos. 202, 203, 210]. After considering the parties' submissions and evidence, the Court concludes that Mr. Stacy's motion should be denied.[1]

## BACKGROUND

Defendants Matthew Alan Stacy, Chong "Alex" Phu, and Chanh "Shawn" Phu stand charged in an eight count Indictment with various marijuana related offenses. Two of those charges are asserted against Mr. Stacy. Count 1 alleges that Mr. Stacy and Mr. Alex Phu conspired from August 2019 to March 2023 to help marijuana traffickers evade state laws that restrict medical marijuana cultivation to Oklahoma residents. Count 2 alleges that Mr. Stacy maintained a drug involved premises by knowingly renting his property to individuals who were unlawfully operating a marijuana farm. Mr. Stacy contends that his conduct complied at all times with then applicable state medical marijuana law.

After Oklahoma legalized the licensed use, sale and growth of marijuana by ballot initiative in 2018, the Oklahoma legislature passed the Oklahoma Medicinal Marijuana and Patient Protection Act (OMMPPA) in August 2019. *See* Okla. Stat. tit. 63, § 427.1, et seq. Among other things, the OMMPPA set out the requirements for obtaining a commercial grower license from the Oklahoma Medical Marijuana Authority (OMMA), which is a license that permits an entity to cultivate, prepare, and package medical marijuana. *Id.* at §§ 427.2(31); § 427.14(A). To obtain a license, an applicant applying as an entity must

---

[1] Defendants Chong "Alex" Phu and Chanh "Shawn" Phu both filed motions [Doc. Nos. 68, 91] seeking to join in Defendant Stacy's Motion. These motions are granted for the limited purpose of allowing Defendants to join in Mr. Stacy's motion. However, because neither Alex Phu nor Shawn Phu presented any evidence in support of their position, they have not met their burden and their request to enjoin the prosecution is denied.

show that 75% ownership by an Oklahoma resident. *Id.* at § 427.14(E)(7). Possession of marijuana without a valid license or in amounts that exceed the statutory limits remains prohibited under state law and "is generally a crime in Oklahoma." *State v. Roberson*, 492 P.3d 620, 623 (Okla. Crim. App. 2021). Additionally, even prior to the passage of the OMMPPA, Oklahoma state law required every person who manufactures, distributes, or dispenses any controlled dangerous substance within the state to obtain a registration with the Oklahoma State Bureau of Narcotics (OBN). Okla. Stat. tit. 63, §§ 2-302; 2-401.

Although Oklahoma law permits certain conduct related to the possession or cultivation of medical marijuana, federal law plainly does not. Under the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*, it is unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or simply to possess, a controlled substance such as marijuana. *United States v. Bilodeau*, 24 F.4th 705, 709 (1st Cir. 2022) (citing 21 U.S.C §§ 841(a)(1), 844(a), 812). That might be the end of the story were it not for a congressional appropriations rider, sometimes called the Rohrabacher-Farr Amendment, which states in relevant part:

> None of the funds made available in this Act to the Department of Justice may be used, with respect to any of the States of…Oklahoma…or with respect to the District of Columbia, Guam, or Puerto Rico, to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana.

Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 542 (2015).[2] Mr. Stacy contends that this appropriations rider prohibits the DOJ from prosecuting individuals for actions taken in compliance with state medical marijuana laws. He argues that his actions complied with state law and the prosecution must therefore be enjoined pursuant to the appropriations rider.

## DISCUSSION

Before reaching the merits of Mr. Stacy's motion, the Court addresses two jurisdictional challenges raised by the government. First, the government argues that this Court lacks jurisdiction to enjoin the prosecution based on "the longstanding maxim that equity will not enjoin a criminal prosecution." *See* United States' Response at 13. True, in most circumstances, "federal criminal defendants cannot obtain injunctions of their ongoing prosecutions." *United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016). Here, however, Mr. Stacy has not initiated a separate civil suit to enjoin his prosecution. Rather, Mr. Stacy is "seeking to enforce in the criminal proceeding itself a deliberately-expressed legislative provision which, if applicable, would prohibit the Government from expending funds to prosecute[.]" *United States v. Samp*, No. 16-CR-20263, 2017 WL 1164453, at *5 n.1 (E.D. Mich. Mar. 29, 2017). Given that unique context, the Court agrees with the Ninth Circuit's conclusion in *McIntosh,* 833 F.3d at 1172-73:

> Even if Appellants cannot obtain injunctions of their prosecutions themselves, they can seek—and have sought—to enjoin DOJ from spending funds from the relevant appropriations acts on such prosecutions. When

---

[2] "This language has been included in every appropriations bill since 2014, differing only as to the states and jurisdictions that are named." *United States v. Jackson*, 388 F. Supp. 3d 505, 509 (E.D. Pa. 2019).

> Congress has enacted a legislative restriction like § 542 that expressly prohibits DOJ from spending funds on certain actions, federal criminal defendants may seek to enjoin the expenditure of those funds, and we may exercise jurisdiction over a district court's direct denial of a request for such injunctive relief.

Based on this conclusion, and cognizant of the fact that numerous district courts have considered motions similar to Mr. Stacy's, the Court is satisfied that it has jurisdiction to resolve the merits of the dispute.[3]

Second, the government contends that Mr. Stacy does not have standing to seek an injunction of his prosecution. According to the government, both the traceability and redressability elements of standing are lacking because an injunction preventing the government from spending funds to prosecute Mr. Stacy for implementing his business structure would not reach the other criminal acts charged in the Indictment. In other words, even if Mr. Stacy obtained the injunction he seeks, the prosecution of the other alleged criminal conduct could move forward. The government is construing Mr. Stacy's request too narrowly as his motion argues that his conduct complied with state law at all times. In any event, Article III's standing requirement generally "does not restrict the opposing party's ability to object to relief being sought at its expense" or bear on a criminal defendant's "capacity to assert defenses in the District Court." *Bond v. United States*, 564 U.S. 211, 217 (2011); *see also McIntosh*, 833 F.3d at 1174 (finding that criminal defendants seeking to enjoin prosecution "clearly had Article III standing to pursue their challenges

---

[3] In its proposed findings of fact, the United States argues for the first time that the motion could be construed as one seeking dismissal of the Indictment. However, because the Court denies Mr. Stacy's motion, there is no need to determine the precise relief that would be required in the event the motion was granted.

below because they were merely objecting to relief sought at their expense"). Accordingly, the Court finds that Mr. Stacy has standing to seek an injunction based on the Rider.

Turning to the merits of the motion, the parties first dispute whether the Rider is even applicable to the prosecution of an individual, such as Mr. Stacy. Relying on what it describes as the plain text of the Rider, the government argues that it prohibits the expenditure of appropriated funds to take action against a state but says nothing about prosecuting individuals. However, as Mr. Stacy notes, the weight of authority holds otherwise.

The Ninth Circuit's opinion in *McIntosh*, 833 F.3d at 1175-77, was the first to address the scope of the Rider. After analyzing the statutory text and its place in the overall statutory scheme, the Ninth Circuit held that the Rider "prohibits DOJ from spending funds from relevant appropriations acts for the prosecution of individuals who engaged in conduct permitted by the State Medical Marijuana Laws and who fully complied with such laws." *Id.* at 1177. In *United States v. Bilodeau*, 24 F.4th 705, 713-715 (1st Cir. 2022), the First Circuit agreed with *McIntosh's* reading and held that the Rider prohibits the prosecution of individuals who comply with state medical marijuana laws. Numerous district courts have reached the same conclusion.[4] *See, e.g., United States v. Blomquist,*

---

[4] The Tenth Circuit has not squarely addressed the Rider's reach but has described it as "defunding the Justice Department's prosecution of the exchange of medical marijuana where it is legal under state law." *Green Sol. Retail, Inc. v. United States*, 855 F.3d 1111, 1114 (10th Cir. 2017); *see also Sandusky v. Goetz,* 944 F.3d 1240, 1242 (10th Cir. 2019).

361 F. Supp. 3d 744, 747 (W.D. Mich. 2019); *United States v. Jackson*, 388 F. Supp. 3d 505, 507 (E.D. Pa. 2019).

The Court finds it unnecessary to resolve this dispute and assumes that the Rider prohibits the expenditure of appropriated funds for the prosecution of individuals. Operating under that assumption, the Court next considers whether Mr. Stacy's conduct complied with Oklahoma's medical marijuana laws.

Count 1 of the Indictment charges Mr. Stacy with conspiracy to manufacture, distribute, and possess with intent to distribute marijuana. The Indictment alleges that, as part of the conspiracy, Mr. Stacy helped non-residents obtain OMMA licenses and OBN registrations to grow marijuana by listing residents on the licenses and registrations that had no relationship to the marijuana grow operation and by instructing clients that they could grow marijuana without the required OBN registration. Count 2 of the Indictment alleges that Mr. Stacy operated a drug involved premises by knowingly renting his land for the purpose of manufacturing, distributing, and storing marijuana. The evidence presented in the parties' briefing and at the evidentiary hearing established the following:

1. Mr. Stacy and his law firm utilized a two-entity business structure to help non-residents of Oklahoma obtain commercial grower licenses from the Oklahoma Medical Marijuana Authority. According to Mr. Stay's own description, the business structure works as follows: "First, the Stacy Legal Group created a limited liability company ("Licensed Manufacturing LLC") for the purpose of applying for a license with OMMA and later (after OMMA licensure) for applying for OBN registration. The members of that Licensed Manufacturing LLC often included a local resident to fulfill the legal requirement that 75% of the "members" be residents of Oklahoma. See 63 O.S. §422(B)(4). In this circumstance, the local resident would be compensated $5,000.00 per annum for the value of his or her contribution to the operation—i.e., serving as a local resident. Second, the Stacy Legal Group created a different limited liability company to manage the grow operation ("Management Company LLC"). Third, the Stacy Legal Group drafted a management agreement,

to be executed by the Licensed Manufacturing LLC and the Management Company LLC pursuant to which the Licensed Manufacturing LLC paid the Management Company LLC a management fee of 100 percent of sales revenue in exchange for an annual payment (e.g., $5,000) to the Licensed Manufacturing LLC." *See* Doc. No. 67 at 21-22.

2. The management agreement makes clear that the management company, and not the license holder, is entirely responsible for the management and operation of the grow operation. Further, although the agreement provides that the marijuana is the "exclusive property" of the license holder, the management company has the right to sell marijuana on behalf of the licensing company and the management company receives 100% of the revenue. *See* Doc. No. 67-5 at ¶¶ 2-5; 8.

3. Mr. Stacy utilized this business structure on dozens of applications, sometimes using the same Oklahoma resident on several different applications. Evid. Hrg. Tr. at 310:24-20; Doc. No. 202-1. One of those individuals was Helen Carrillo, who was listed as the 75% owner on numerous applications. *Id.* When OBN agents spoke to Ms. Carrillo at her home, she indicated that she had no role in the operations of the marijuana grow apart from being paid to have her name listed on the license. Govt.'s Hrg. Ex. 20.

4. On several occasions during 2020 and 2021, OBN agents inspected marijuana grow facilities associated with Mr. Stacy, observed that they were growing marijuana without a registration (or committing other violations), and took no law enforcement action and/or subsequently issued OBN registrations to the facility. *See, e.g.,* Def.'s Hrg. Ex. 54-56, 59, 62, 63, 67, 70, 71, 73, 78, 92, 108, 121-123 Evid. Hrg. Tr. at 34:13-20, 225:13-227:5, 229:3-22; 373:6-374:23. At one inspection on October 15, 2020, an OBN agent referred to the growth of marijuana before a license as "an admin thing." Evid. Hrg. Tr. 17:19-23, Def.'s Hrg. Ex. 99.

5. During some of the inspections, OBN agents observed indications that the marijuana grow facilities were involved in human trafficking or black-market marijuana sales. Evid. Hrg. Tr. 248:19-249:18, 263:23-24, 268:24-24, 354:8-18

6. On June 4, 2020, Mr. Stacy was told by OBN's chief agent and general counsel that growing marijuana without an OBN registration was illegal. *Id.* at 253:8–15; 286:4–8; 204:1–7. Several marijuana grows associated with or represented by Mr. Stacy grew marijuana without a registration after this date. *See, e.g.,* Def.'s Hrg. Ex. 58, 63, 65, 67, 70, 71, 121.

7. In May and June 2021, Mr. Stacy corresponded and met with OBN officials regarding his business structure. OBN repeatedly maintained that the managing

  company was required to have an OBN registration. Evid. Hrg. Tr. at 207:11-210:25. On June 30, 2021, OBN's general counsel sent Mr. Stacy a letter reiterating this position and "officially" denying several OBN registration applications. Def.'s Hrg. Ex. 53, 66, 87, 101, 105.

8. Mr. Stacy's secretary testified that there was a period of change at the Stacy Legal Group starting in July 2021, the office was making an effort to remove local residents from licenses and registrations, and to advise clients that it is illegal to operate a medical marijuana business without both a registration from OBN and a license from OMMA. Evid. Hrg. Tr. 90:15-92:24, 99:4-102:2, 155:8-24; Def.'s Hrg. Ex. 4, 12, 22, 23, 25, 27, 31. Some applications submitted by the Stacy Legal Group after July 2021 continued to list local residents that were not involved in the operating of the marijuana grows. Mr. Stacy's secretary testified that this was a mistake and another employee had been tasked with removing this particular resident. Evid. Hrg. Tr. 108:11-17.

As the moving party, Mr. Stacy bears the burden of proving by a preponderance of the evidence that he complied with Oklahoma state law. *See United States v. Evans*, 929 F.3d 1073, 1077 (9th Cir. 2019) ("Generally, the party seeking an injunction bears the burden of showing that he is entitled to such a remedy."). He has not met that burden. [5]

  Oklahoma's medical marijuana statutory scheme starts with Okla. Stat. tit. 63, § 422, which codified the successful ballot initiative petition to legalize medical marijuana.

---

[5] The Ninth Circuit requires the defendant to show that he "strictly complied with all relevant conditions imposed by state law," *McIntosh*, 833 F.3d at 1179, whereas the First Circuit has suggested that "substantial compliance" with state law is required. *United States v. Sirois,* 119 F.4th 143, 152 (1st Cir. 2024); *see also Bilodeau,* 24 F.4th at 713 (noting that "the potential for technical noncompliance is real enough that no person through any reasonable effort could always assure strict compliance"). There is no need to delve into this dispute because the Court would reach the same conclusion even under the First Circuit's more lenient articulation of the standard. To the extent Mr. Stacy argues that he need only show that he "reasonably believed his actions complied with state law," the Court finds no support for this argument in the text of the Rider or case law. The evidence presented indicates that Mr. Stacy was not in substantial compliance with state law, and it was not merely technical noncompliance or the result of not being able through "reasonable effort" to assure strict compliance.

This statute, which went into effect in August 2018, provided that all applicants for a commercial grower license must be approved if they meet certain criteria, which included the following:

> 3. All applying entities must show that all members, managers, and board members are Oklahoma residents;
> 4. An applying entity may show ownership of non-Oklahoma residents, but that percentage ownership may not exceed twenty-five percent (25%);
> 5. All applying individuals or entities must be registered to conduct business in the state of Oklahoma;
> 6. All applicants must disclose all ownership;

Okla. Stat. tit. 63, § 422(B)(2018).[6]

One year later, in August 2019, the Oklahoma Medical Marijuana and Patient Protection Act went into effect. The OMMPPA established the requirements for obtaining a commercial grower license. Okla. Stat. tit. 63, § 427.14 (2019). In language that resembles the provisions of Okla. Stat. tit. 63, § 422(B), the OMMPPA provides that all applications for a marijuana business license "shall be approved for licensing review" if they meet certain criteria, which included the following:

> c. any applicant applying as an entity shall show that seventy-five percent (75%) of all members, managers, executive officers, partners, board members or any other form of business ownership are Oklahoma residents pursuant to paragraph 11 of this subsection,

---

[6] Paragraph six of this statute was amended on November 1, 2022 to the following "[a]ll applicants must disclose all ownership interests in the commercial grower operation." Okla. Stat. tit. 63, § 422(B)(6). Mr. Stacy contends this amendment undercuts the argument that disclosure of all ownership in the commercial grower operation was impliedly required by the original version of the statute. The Court disagrees. Even before this amendment, the OMMPPA, which went into effect in 2019, required all applicants to disclose "all ownership interests pursuant to this act." Okla. Stat. tit. 63, § 427.14(E)(7)(e)(2019). An entity exercising total control over the marijuana, the grow facility, the sales, and the profits of the business is an ownership interest that the applicant was required to disclose.

> d. all applying individuals or entities shall be registered to conduct business in the State of Oklahoma,
> e. all applicants shall disclose all ownership interests pursuant to this act,…

*Id.* at § 427.14(E)(7). An "owner" means

> except where the context otherwise requires, a direct beneficial owner including, but not limited to, all persons or entities as follows:…
>
> > d. all members that own an interest in a limited liability company,…
> > i. any other person holding an interest or convertible note in any entity which owns, operates or manages a licensed facility;

Okla. Stat. tit. 63, § 427.2(46)(2019). The OMMPA further provides that "[a]ll applications shall be complete and accurate in every detail" and that "[a]ll applicants shall submit information…in a full, faithful, truthful and fair manner." *Id*. at § 427.14(E)(4); (K).[7]

Additionally, the OMMPPA requires all license applicants "to submit a registration with the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control as provided in Sections 2-302 through 2-304 of Title 63 of the Oklahoma Statutes." *Id.* at § 427.14(E)(12). Those provisions are part of Oklahoma's Uniform Controlled Dangerous Substances Act. The UCDSA makes it unlawful to manufacture or distribute a controlled dangerous substance, including marijuana, unless the person or entity obtains a registration from OBN. Okla. Stat. tit. 63, §§ 2-302; 2-401.

Mr. Stacy was not in substantial compliance with these provisions. First, the applications submitted by Mr. Stacy to obtain OMMA licenses did not disclose that the Oklahoma resident applying for a commercial grower license is not involved in the

---

[7] Although the OMMPA has been amended numerous times since its enactment, the requirements outlined above have not changed throughout the relevant time frame.

11

commercial growing operation at all. Rather, a separate entity (which does not meet the residency requirements) is entirely responsible for the grow operation. By submitting OMMA applications in this manner, Mr. Stacy failed to comply with the OMMPPA's residency requirements, its requirement to disclose all ownership interests, or its requirement to submit information in a full and fair manner.

Mr. Stacy has also not met his burden of showing that he substantially complied with the UCDSA. Contrary to Mr. Stacy's argument, neither the passage of the ballot initiative nor the OMMPPA relieved an entity seeking to grow or sell marijuana from obtaining a registration from OBN. Rather, the OMMPPA expressly indicated that an applicant must submit a registration as provided in the UCDSA. The UCDSA requires every person who manufactures or distributes a controlled substance to obtain a registration from OBN. *See* Okla. Stat. tit. 63, §§ 2-302; 2-401. However, several of the marijuana grows Mr. Stacy assisted were growing marijuana without a registration from OBN. Notably, this continued even after Mr. Stacy was explicitly told by OBN's chief agent and general counsel that operating without a registration was illegal.[8]

---

[8] Mr. Stacy argues that the managing company was not required to obtain a registration from OBN because it was acting as the agent of the licensing company. In support, he relies on Okla. Stat. tit. 63, § 2-302(H), which provides that "[a]n agent, or employee thereof, of any registered manufacturer" shall not be required to register "if such agent is acting in the usual course of such agent's or employee's business or employment." The Court is not persuaded that the management company was acting as the agent of the licensing company such that this exception would apply. The management contract indicates that the managing company had exclusive control over both the grow facility and the marijuana. Further, the evidence indicates that the license holder had no involvement in selecting the management company or any aspect of the grow operations. The Court is not persuaded that the managing company was "act[ing] on behalf of" the registration holder such that they could be describing as the agent of the registration holder. *See* Okla. Stat. tit. 63 §2-101(2).

At bottom, Mr. Stacy's business structure and conduct resulted in unlicensed and unregistered entities operating commercial marijuana farms. Further, the entire point of the business structure was to evade the OMMPPA's residency requirements. This runs afoul of specific provisions of Oklahoma's medical marijuana laws and is not mere technical noncompliance.

Mr. Stacy presents a number of arguments to sustain his burden of showing compliance with state law, but none are persuasive. He relies heavily on OBN's lack of enforcement action, characterization of certain violations as administrative rather than criminal, and subsequent updates to its application process. But Mr. Stacy was explicitly informed by OBN as early as June 4, 2020 that growth of marijuana without a registration was illegal and this position did not substantially change throughout the relevant time period. OBN's failure to enforce these provisions– whether stemming from a discretionary decision to not pursue certain cases or because its enforcement capacity was overwhelmed – does not establish that the conduct was in compliance with state law. *See Sirois,* 119 F.4th at 156 (finding that defendant was not in compliance with state law even though there was evidence that state agency's investigation into defendant's operations resulted in no finding of noncompliance and reinstatement of license);

Mr. Stacy also argues that his conduct arose from his work as a lawyer and that he is permitted to give legal advice to his clients. However, the evidence indicates that he was not merely giving legal advice or opinions about Oklahoma's medical marijuana laws. Rather, he was repeatedly helping unqualified third parties obtain OMMA licenses and was associated with numerous marijuana grows (including some that showed evidence of

13

human trafficking or sales outside of the legal market) that were operating without the required OBN registrations.

Mr. Stacy also contends that he immediately changed his business structure and started counseling clients that they must have an OBN registration upon receiving OBN's "official" denial letter in June 30, 2021. However, the Court is not persuaded that this forecloses the expenditure of funds on the conspiracy charge. The Indictment alleges that Mr. Stacy utilized his business structure as part of a conspiracy from August 2019 to March 2023 to assist marijuana traffickers with obtaining licenses and registration. Mr. Stacy (and his legal group) sought OMMA licenses utilizing his business structure and assisted marijuana grows that were operating without OBN registrations throughout at least 2020 and 2021. Even if Mr. Stacy eventually changed his operations, his actions throughout a significant part of the charged conspiracy did not comply with state law. The appropriations Rider therefore does not prohibit the expenditure of appropriated funds for the prosecution of Mr. Stacy's alleged involvement in the conspiracy.[9]

With respect to Count 2, which charges maintaining a drug involved premises, Mr. Stacy contends that he never knowingly or intentionally leased his property for the purpose

---

[9] The Indictment alleges that Mr. Stacy violated state law in furtherance of the conspiracy in several other ways. Mr. Stacy contends that the conduct described in these other allegations was also in compliance with state law and can therefore not form the basis of a federal prosecution. In support, Mr. Stacy relies on the Ninth Circuit's decision in *United States v. Kleinman*, 880 F.3d 1020, 1028 (9th Cir. 2017), which describes the Rider as requiring "a count-by-count analysis to determine which charges, if any, are restricted." Mr. Stacy has not, however, cited to any authority establishing that each allegation concerning the manner and means of the conspiracy must independently violate state law before a conspiracy prosecution can proceed.

of engaging in unlawful marijuana trafficking. He points to an audio recording, purportedly between himself and his tenants occurring in summer of 2021, where he states that both an OMMA license and OBN registration are required to operate. Def.'s Hrg. Ex. 113. Although Mr. Stacy describes this audio recording as self-authenticating with respect to the date of the conversation or the parties to it, the Court does not agree. In any event, the recording does nothing to cast doubt on the allegation that Mr. Stacy rented his property with knowledge that the tenants wanted to grow marijuana, that the tenants subsequently operated a marijuana farm on the property, or that the tenants were selling marijuana without the required licenses. The Court is therefore not persuaded that Mr. Stacy has met his burden of showing that the conduct alleged in Count 2 substantially complied with state law.

Last, the Court finds it relevant that Mr. Stacy is being prosecuted by the State of Oklahoma for conspiracy to defraud the state, offering a false instrument, and other charges that arise from the same events involved in this action. *See State of Oklahoma v. Matthew Alan Stacy*, Case No. CF-2022-0251 (Garvin County, Okla.). This is significant because the Rider is concerned with "prevent[ing]" states "from implementing their own" medical marijuana laws. But where the state itself is prosecuting the defendant for the same conduct, the Court is hard pressed to conclude that permitting this federal prosecution would somehow "prevent" the state from implementing any of its laws. *See Bilodeau, 24 F.4th at 714* ("Congress surely did not intend for the rider to provide a safe harbor to all caregivers with facially valid documents without regard for blatantly illegitimate activity in which those caregivers may be engaged and which the state has itself identified as falling

outside its medical marijuana regime."); *United States v. Sirois*, No. 1:21-CR-00175-LEW, 2023 WL 5333115, at *3 (D. Me. Aug. 18, 2023) ("I also conclude that an order enjoining prosecution based on the Rohrabacher-Farr Amendment would be ill-advised here, as the State of Maine, through its Office of Marijuana Policy, ultimately requested an investigation based upon, among other things, the report of black market sales by an insider and possible violation of the rule against collective grow operations.").

## CONCLUSION

Mr. Stacy has not met his burden of showing that his conduct substantially complied with specific rules of state law that authorize medical marijuana and the Rider therefore does not prevent the Department of Justice from expending funds on the prosecution. Accordingly, Defendant Matthew Alan Stacy's Motion to Enjoin Prosecution and for Evidentiary Hearing [Doc. No. 67] is DENIED.

IT IS SO ORDERED this 27th day of February, 2025.

_____
DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE